[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 22, 2001
THOMAS K. KAHN
CLERK

_____

No. 98-5404

_____

D. C. Docket No. 97-00410 CV-UUB

EMPLOYERS INSURANCE OF WAUSAU,
a Mutual Company,

Plaintiff-Counter-
Defendant-Appellant,

versus

BRIGHT METAL SPECIALTIES, INC.,

Defendant-Counter-
Claimant, Cross-
Claimant-Cross-
Defendant-Appellee,

ROGERS CONSTRUCTION COMPANY,

Defendant-Cross-
Defendant-Cross-
Claimant-Third-Party
Plaintiff-Appellee.

_____
_

BRIGHT METAL SPECIALTIES, INC.,

Plaintiff-Cross-

Defendant-Appellee,

versus

EMPLOYERS INSURANCE OF WAUSAU,
a Mutual Company,

Defendant-Cross-
Defendant-Appellant,

ROGERS CONSTRUCTION COMPANY,

Defendant-Cross-
Claimant.

_____

No. 98-5405
_____

D. C. Docket No. 97-00410-CV-UUB

EMPLOYERS INSURANCE OF WAUSAU, a Mutual Company,

Plaintiff-Counter-
Defendant-Appellee,

versus

BRIGHT METAL SPECIALTIES, INC.,

Defendant-Counter-
Claimant-Cross-
Claimant-Cross-
Defendant-Appellee,

ROGERS CONSTRUCTION COMPANY,

Defendant-Cross-
Defendant-Cross-

2

Claimant-Third-Party
Plaintiff-Appellant.

_____
_

BRIGHT METAL SPECIALTIES, INC.,

Plaintiff-Cross-
Defendant-Appellee,

versus

EMPLOYERS INSURANCE OF WAUSAU,
a Mutual Company,

Defendant-Cross-
Defendant-Appellee,

ROGERS CONSTRUCTION COMPANY,

Defendant-Cross-
Claimant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(May 22, 2001)**

Before EDMONDSON, FAY and GARWOOD*, Circuit Judges.

_____
        *Honorable Will L. Garwood, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

FAY, Circuit Judge:

Appellants Employers Insurance of Wausau ("Wausau") and Rogers Construction Company ("Rogers") appeal the district court's order compelling arbitration of a claim asserted by Appellee Bright Metal Specialties, Inc. ("Bright") arising from a dispute on a Government construction project in Everglades National Park. The district court held that Wausau, a Miller Act surety, became a party to Bright's subcontract and the arbitration provision therein by virtue of Wausau's Takeover Agreement with the Government, Wausau's Completion Contract with its completion general contractor, Rogers Construction Co. ("Rogers"), and the Ratification Agreement with Bright. Wausau argues that it did not contractually agree to arbitrate with Bright, that it is not bound by the arbitration provision in Bright's subcontract, and that the Miller Act precludes arbitration of a claim against a Miller Act surety such as Wausau. Rogers concedes that it is bound by Bright's subcontract, but contends that Bright's claim is excluded from arbitration pursuant to an arbitration exception in the subcontract. Moreover, Bright contests our jurisdiction to hear this appeal. We conclude that the district court's order was an appealable "final decision" and affirm the arbitration order with respect to both Wausau and Rogers.

4

I. Background

The parties agree to the following facts, most of which are established by contract. On or about July 16, 1993, the National Park Service ("Government") contracted with A-1 Construction/BellincCo. ("A-1") for the repair of roofs to certain buildings located in the Everglades National Park (the "Project"). Wausau, as contract surety, provided performance and payment bonds for the Project on behalf of A-1, its principal, in favor of the Government, as required by the Miller Act, 40 U.S.C. § 270, et seq. In September 1993, A-1 subcontracted a portion of the Project work to Bright pursuant to a written agreement (the "Subcontract" or "Bright/A-1 Subcontract") that included an arbitration clause.

The Government subsequently terminated A-1 for its default on the Project, and called upon Wausau to complete the work pursuant to the performance bond. On or about May 20, 1994, the Government and Wausau entered into a Takeover Agreement by which Wausau agreed to complete the prime contract for A-1. On or about May 26, 1994, Wausau entered into a Contract for Completion and Construction (the "Completion Contract") with Rogers whereby Rogers became the completing contractor for all remaining work under the prime contract. Pursuant to the Completion Contract, Wausau agreed to assign to Rogers all of

5

Wausau's right, title and interest in and to A-1's executory subcontracts for the performance of Project work.

On or about June 14, 1994, Bright and Wausau entered into a Ratification Agreement which resolved Bright's payment bond claim and ratified the Bright/A-1Subcontract. First, Wausau and Bright resolved claims relating to monies due Bright for work performed prior to A-1's termination. Second, Bright agreed to complete the Subcontract and agreed to start work on the Project within seven (7) days after request by Wausau, its agent, "or assigns, including any completion contractor engaged by [Wausau]." Third, the Ratification Agreement provided that Wausau could "assign its rights under the [A-1] subcontract and this agreement" to a completion contractor. Finally, the parties agreed that Wausau would pay Bright the remaining retainage, as fulfillment of its obligations to Bright, if work did not begin within a specified period. Thereafter, Wausau required Bright to complete the Subcontract with Rogers as the completion contractor. Bright resumed work on the Project in June 1994.

In December 1994, Bright and Wausau settled a payment bond claim previously submitted by Bright for work, labor and/or materials performed and/or furnished under its Subcontract with A-1.[1]

Near completion of the Project, Bright sought additional compensation for delays and damages caused by the Government. Ultimately, Bright submitted to Rogers a request for "equitable adjustment" ("REA") under the Subcontract. As required by the contract documents, Rogers submitted the request to Wausau for presentation by Wausau to the Government. Bright, Rogers, Wausau and the Government met in Denver, Colorado in February 1996 to address Project claims, including Bright's REA. At the meeting, the Government offered to settle Bright's REA for approximately $10,000, less than two percent (2%) of the amount sought by Bright. Bright declined the settlement offer and left the meeting. After Bright left the meeting, Wausau accepted the Government's settlement offer without Bright's approval or consent. Bright did not submit any further claims against the Government, directly or through Rogers or Wausau, regarding the amounts sought in the REA.

---

[1] Pursuant to this settlement agreement, Wausau paid Bright the agreed amount in exchange for a release signed by Bright of all claims of any nature which Bright might have against the Government or against Wausau under its surety bond.

In January 1997, Bright filed a Demand for Arbitration with the American Arbitration Association ("AAA") for alleged breach of contract by Rogers and Wausau. Bright claimed losses in the amount of $944,000 plus interest, attorney's fees and costs.

In February 1997, Wausau filed a complaint in the District Court for the Southern District of Florida against Rogers and Bright seeking declaratory and injunctive relief against the arbitration (Case No. 97-410-Civ-Marcus). In a separate action against Wausau and Rogers, Bright filed a Motion to Compel Arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, and based on an arbitration clause in the Subcontract between Bright and A-1 (Case No. 97-433-Civ-Marcus). Wausau and Rogers filed claims for declaratory and injunctive relief seeking to stay the arbitration.[2]

The two actions were consolidated and referred to Magistrate Judge Ted E. Bandstra. On December 22, 1997, Magistrate Judge Bandstra issued an Amended Report and Recommendation that Wausau and Rogers be compelled to arbitrate

---

[2] Bright filed a counterclaim against Wausau and a cross-claim against Rogers conditioned on the Court denying arbitration. In response to Bright's conditional pleadings, Rogers filed a counterclaim against Bright Metal and its surety, Preferred National Insurance Company.

8

Bright's claim.  The district court, Judge Ungaro-Benages presiding,[3] conducted a de novo review and by order entered September 22, 1998, affirmed the Magistrate's Amended Report and Recommendation granting Bright's Motion to Compel Arbitration, denying Wausau's and Roger's Motions for Injunctive Relief, and denying all remaining motions as moot.  In addition, the district court dismissed each of the underlying consolidated actions in deference to arbitration, and denied Roger's request for reconsideration.

Wausau and Rogers appeal from the district court's decision.  Bright challenges our jurisdiction to hear this appeal asserting that the district court's order was not a final decision with respect to arbitration under 9 U.S.C. § 16(a)(3) of the Federal Arbitration Act ("FAA").

II      Standard of Review

The jurisdictional issue is a question of law, which we review de novo.  See Randolph v. Green Tree Fin. Corp.-Alabama, 178 F.3d 1149, 1152 (11th Cir. 1999).  We review de novo the district court's order compelling arbitration.  See Randolph, 178 F.3d at 1152.

III     Analysis

_____

[3] On January 21, 1998, the district court entered an order transferring the consolidated cases to Judge Ungaro-Benages.

9

C.     "Final Decision" under the Federal Arbitration Act

As a threshold matter, we decide whether we have jurisdiction over this appeal.  Special rules govern appeals from a district court's arbitration order as set forth in section 16 of the FAA.  See 9 U.S.C. § 16; see also American Express Fin. Advisors, Inc. v. Makarewicz, 122 F.3d 936 (11th Cir. 1997).  The question here is whether the district court's order compelling arbitration of Bright's claim and dismissing the underlying actions is a "final decision with respect to an arbitration" within the meaning of the statute.  9 U.S.C. § 16(a)(3).

In arguing that we lack jurisdiction, Bright distinguishes between "embedded" and "independent" proceedings, a distinction this Court has recognized, albeit without using those labels.[4]  See Thomson McKinnon Sec., Inc. v. Salter, 873 F.2d 1397, 1399 (11th Cir. 1989) (cited in Randolph, 178 F.3d at 1155 n.4).  Bright correctly notes that, generally speaking, a decision of the district court is final when it disposes of all the issues framed by the litigation and leaves nothing for the district court to do but execute the judgment.  See Randolph, 178 F.3d at 1154 (quoting Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633 (1945)).  However, Bright contends that the phrase "final decision" does not

---

[4]  An "embedded" proceeding is one that involves both a request for arbitration and other claims for relief.  In an "independent" proceeding, the issue of arbitration is the only issue before the court.  See Green Tree Fin. Corp.-Alabama v. Randolph, 121 S.Ct. 513, 520, 148 L.Ed.2d 373 (2000).

include an order compelling arbitration and dismissing the other claims in the action, when that order occurs in an "embedded" proceeding such as this one.[5]

We find that Bright's argument is foreclosed by the Supreme Court's recent opinion in Green Tree Fin. Corp.-Alabama, 121 S.Ct. 513, 520 (2000). That decision held that a district court order compelling arbitration and dismissing all other claims is "final" within the meaning of § 16(a)(3), and therefore appealable, even when that order occurs in an "embedded" proceeding involving both a request for arbitration and other claims for relief. Green Tree Fin. Corp., 121 S.Ct. at 520-521. Here, as in Green Tree Fin. Corp., the district court directed the parties to resolve the dispute by arbitration and dismissed both cases,[6] leaving the court nothing to do but execute the judgment. Accordingly, we have jurisdiction over the consolidated actions because the arbitration order disposes of all the issues framed by the litigation and leaves nothing for the district court to resolve.

D.     The Applicability of the Subcontract's Arbitration Clause

---

[5] Here, the consolidated actions allege, *inter alia*, breach of contract, release, and performance and payment bond claims related to the underlying merits of the case, in addition to the issue of arbitration. Thus, Bright claims that the arbitration order is not a final decision because it does not decide the merits of the underlying claims.

[6] Although the district court did not specify whether the dismissal was with or without prejudice, the arbitration order clearly disposed of the entire case on the merits and left no part of it pending before the court. Moreover, the district court could have, but did not, stay the case pending arbitration. See Green Tree Fin.Corp., 121 S.Ct. at 520 n.2 (explaining that arbitration order staying rather than dismissing all other claims for relief would not be appealable).

11

Having determined that we have jurisdiction over this appeal, we now turn to the question whether the parties agreed to arbitrate the present dispute. Wausau contends that it may not be compelled to arbitrate because it is not a party to any agreement containing an arbitration clause. Bright argues that Wausau ratified the Subcontract and therefore, assumed the duty to arbitrate pursuant to an arbitration provision therein.

A.    Choice of Law

Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements. See Perry v. Thomas, 482 U.S. 483, 107 S.Ct. 2520 (1987). Federal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration. See Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941 (1983). Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.[7]

B.    Wausau's duty to arbitrate.

---

[7] Although the question of which state's law should govern is an important one, neither the parties nor the courts have focused on this issue. See Scott v. Prudential Securities, Inc., 141 F.3d 1007, 1012 n.6 (11th Cir.1998). As a federal court sitting in diversity, we apply the conflict of law rules of Florida, including Florida contract law, unless the relevant documents provide otherwise. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22 (1941).

12

As an initial matter, Wausau is correct that, under the FAA, no party can be compelled to arbitrate unless that party has entered into an agreement to do so.  See AT & T Tech., Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418 (1986).  Courts, however, have recognized a number of theories under which non-signatories may be bound to the arbitration agreements of others.  See, generally, Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773 (2d. Cir. 1995).  These theories arise out of common law principles of contract and agency law: 1) incorporation by reference; 2) assumption; 3) agency;  4) veil-piercing/alter ego; and 5) estoppel.  See id. at 776; see also MSDealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999).

In this case, the district court concluded that Wausau agreed to arbitrate disputes with Bright when it "stepped into" the shoes of A-1 and signed the Ratification Agreement with Bright.  The court reasoned that the Ratification Agreement, signed by Wausau and Bright, incorporated by reference the Subcontract, thus, expressing Wausau's intent to arbitrate disputes arising out of the Subcontract in accordance with the arbitration provision therein.[8]  See e.g., United States Fidelity and Guaranty Co. v. West Point Constr. Co., 837 F.2d 1507

_____

[8]  The district court applied Georgia law to interpret the Subcontract based on the choice of law provision therein.  See Subcontract, ¶ 15.2.  To the extent that Florida law applied, as the place of performance, the district judge cited Florida law in accord.

13

(11th Cir.1988) (compelling surety to arbitrate where performance bond incorporated by reference subcontract that contained arbitration provision).

We agree with the district court that Wausau is bound by the arbitration provision in the Bright/A-1 Subcontract. By signing the Takeover Agreement, Wausau assumed all duties and responsibilities of A-1 to complete the prime contract in exchange for the balance of the contract price. See e.g., Travelers Indem., et al. v. United States, 16 Cl.Ct. 142 (1988) (holding that surety became a party to the prime contract upon executing a Takeover Agreement with the United States). While the Takeover Agreement did not specifically obligate Wausau to any contractual provisions previously negotiated between Bright and A-1, this agreement clearly reveals Wausau's intent to "step into the shoes" of A-1. The Ratification Agreement, executed with Bright, guaranteed performance of the Subcontract work "according to the terms and conditions of the Subcontract." This agreement evinces Wausau's intent to affirm the Subcontract, including the arbitration provision therein. See Green v. Ford Motor Credit Co., 246 S.E.2d 721, 722-23 (Ga. App. 1978); Port Largo Club, Inc. v. Warren, 476 So. 2d 1330, 1333 (Fla. 3d DCA 1985). Finally, the Completion Contract granted Wausau the option to assign its rights in the Subcontract to Rogers. Read together, these agreements lead us to conclude that Wausau gained the benefits and obligations of the

Subcontract between A-1 and Bright. Thus, Wausau became bound by the arbitration provision in the Subcontract.

Wausau does not contest that it acquired A-1's "rights" under the Subcontract. Pursuant to the Ratification Agreement, Wausau obtained Bright's agreement to complete the Subcontract at no additional cost. Wausau also acquired the right to assign its rights under the Subcontract to a completion contractor. Wausau concedes that it exercised its right to assign the Subcontract to Rogers.[9] However, Wausau contests its obligation to arbitrate under the agreement. This is tantamount to Wausau asking the Court to recognize its rights under the Subcontract without the correlative duties therein.

Wausau argues that it could not have assumed the obligation to arbitrate under the Bright/A-1 Subcontract because that Subcontract automatically terminated, by its own terms, upon the Government's default of A-1 on April 29, 1994. A fair reading of paragraph 10.4 of the Subcontract, however, leads us to conclude that the Subcontract became terminable, but did not automatically

---

[9] Significantly, Rogers concedes that it succeeded to the obligations of A-1 under the Subcontract. This could only be by assignment from Wausau. See Completion Contract (obligating Wausau to assign to Rogers all "[Wausau's] right, title and interest in and to [A-1's] executory Subcontracts").

terminate when the Government defaulted A-1.[10]  Wausau does not assert, and we find no evidence in the record, that Wausau or Bright terminated the Subcontract pursuant to its termination provisions.  We also find it disingenuous for Wausau to have taken full advantage of the Subcontract and now argue that it was not in effect.

Finally, Wausau contends that it cannot be compelled to arbitrate with Bright because the Miller Act places exclusive jurisdiction of claims against Miller Act sureties in federal court.  The district court found that the Miller Act does not preclude arbitration, and alternatively, that Wausau waived any such protection afforded it.  We agree.

Under the Miller Act, a claim against a surety arising under a Miller Act bond shall be brought in federal court.  See 40 U.S.C. § 270a-e.  The Miller Act does not apply here because Bright alleges that Wausau breached the Subcontract; Bright does not pursue a claim against Wausau's payment bond.  Even if it applies, the Miller Act does not preclude arbitration under the FAA where the parties have

---

[10]  The Subcontract provides:

> 10.4 TERMINATION BY OWNER.  Should the Owner terminate
> its contract with the Contractor or any part of which includes the
> Subcontractor's Work, the Contractor shall so notify the
> Subcontractor in writing and upon written notification, this
> Agreement shall be terminated ....

Bright/A-1 Subcontract, ¶ 10.4.

previously agreed to arbitrate disputes.  See United States ex. rel. Portland Constr. Co. v. Weiss Pollution Control Corp., 532 F.2d 1009, 1012 (5th Cir.1976)[11] (staying Miller Act suit pending outcome of arbitration where subcontract contained arbitration provision); United States ex. rel. Capolino Sons, Inc. v. Electronic & Missile Facilities, Inc. 364 F.2d 705 (2d. Cir.1966) (requiring subcontractor to arbitrate Miller Act payment bond claim pursuant to arbitration provision in subcontract, which provision was not prohibited by the Miller Act). Accordingly, we conclude that Wausau assumed A-1's obligations to arbitrate with Bright when Wausau took over the Project and ratified the Subcontract.[12]

C.    Roger's Duty to Arbitrate

Rogers concedes that it is bound by the arbitration provision in the Subcontract.  However, Rogers objects to arbitration on the basis of an exception to arbitration contained in the Subcontract.  Specifically, Rogers claims that § 14.2(b) of the Bright/A-1 Subcontract expressly excludes from arbitration "pass

---

[11]  Fifth Circuit cases decided before October, 1981 are binding precedent in this Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1210 (11th Cir.1981).

[12]  Having found that the dispute is arbitrable, we do not address Wausau's claim that Bright released Wausau from its obligations under the Subcontract.  See 9 U.S.C. § 4; see also Aluminum, Brick & Glass Workers Int'l Union v. AAA Plumbing Pottery Corp., 991 F.2d 1545, 1550 (11th Cir.1993) (explaining that courts are not permitted to address defenses to disputes within the scope of an arbitration clause).

17

through" claims, or claims asserted by Bright up the ladder to the Government.[13] Pursuant to this exception, the agreement to arbitrate between Rogers and Bright would not apply to any "claim" brought by Bright against Rogers if Rogers asserted that the claim, in whole or in part, was against the Government ("Owner") since the contract between Rogers and the Government does not provide for binding arbitration. Based on the Magistrate Judge's findings, the district court concluded that the exception does not apply for two reasons: 1) Bright's REA was not a "claim" under the Subcontract; and 2) Bright's REA was never asserted against Rogers as required by the exception provision.

Our review of the record evidence accords with the findings of the Magistrate Judge. The arbitration exception set forth in paragraph 14.2 of the Subcontract does not apply because Bright's REA is not a "claim" under the Subcontract. The Subcontract provides that claims relating to the Government had to be submitted by Rogers "in the manner and within the time elements provided in

---

[13] Paragraph 14.2 of the Subcontract provides in relevant part:
14.2 EXCEPTIONS. The agreement to arbitrate shall not apply to any claim:
***
(b) asserted by the Subcontractor against the Contractor if the Contractor asserts said claim, either in whole or part against the Owner, or asserted by the Owner against the Contractor, when the contract between the Contractor and Owner does not provide for binding arbitration ....

Subcontract, ¶ 14.2.

18

Contract Documents for like claims by the Contractor upon the [Government]."

Subcontract, ¶ 6.2. The prime contract between A-1 and the Government required

the Contractor (A-1 and later Rogers) to submit all claims in accordance with the

Contract Disputes Act.[14] See Prime Contract, Article 37. Moreover, the prime

contract provided that a demand for payment of money exceeding $50,000 was not

a claim under the Contract Disputes Act until it was certified by the Contractor.[15]

In the district court, Rogers conceded that Bright submitted a claim against

the Government in an amount exceeding $1,000,000 for delays and damages

caused by the Government. See Roger's Response to Bright's Motion to Compel.

Ultimately, Rogers and/or Wausau advised Bright to submit its claim as an REA,

rather than as a certified claim under the Contract Disputes Act. The parties agree

that Bright's REA was never certified, as the prime contract required for any and

---

[14] Contract Disputes Act of 1978, 41 U.S.C. § 601 et. seq

[15] Article 37 of the Prime Contract provides in pertinent part:

> (c) "Claim", as used in this clause, means a written demand or
> written assertion by one of the contracting parties seeking as a
> matter of right, the payment of money in a sum certain, the
> adjustment or interpretation of contract terms, or other relief
> arising under or relating to this contract.
> ...
> However, a written demand or written assertion by the Contractor
> seeking the payment of money exceeding $50,000 is not a claim
> under the Act until certified as required by subparagraph (d)(2)
> below.

Government/A-1 Prime Contract dated July 16, 1993, ¶ 37 (emphasis added).

19

all claims exceeding $50,000.  See Prime Contract, ¶ 37.  Thus, the REA is not a "claim" as defined in Article 37 of the prime contract, and Rogers may not rely on the arbitration exception in the Subcontract because that same Subcontract required Rogers to certify claims relating to the Government.  See e.g., Woodrow Wilson Constr. Co., Inc. v. MMR-Radon Constructors, Inc., 635 So.2d 758 (La. Ct. App. 1994) (affirming arbitration order, under terms of subcontract providing for arbitration unless contractor submitted claim against owner, where general contractor did not submit claim against owner in accordance with procedures specified).

Given our decision that Bright's REA was not a "claim" subject to the arbitration exception under the Subcontract, we do not reach the district court's alternate basis for compelling Rogers to submit to arbitration.[16]  We also do not address Roger's argument that Bright's claim did not require certification to be submitted as an REA, and alternatively that only Wausau could certify Bright's claim.  Regardless of who was responsible for certification or whether Bright's claim should have been certified, the exception to arbitration does not apply because there is no "claim" as defined by Article 37 of the prime contract.  See

---

[16]  Namely, the district court found that Bright never asserted its demand for additional compensation against Rogers, as required by the exception provision.  See Subcontract, ¶ 14.2, supra at n.11.

Aluminum, Brick & Glass Workers Int'l Union v. AAA Plumbing Pottery Corp., 991 F.2d 1545, 1550 (11th Cir.1993) (explaining that courts are not permitted to address defenses to disputes within the scope of an arbitration clause).

Bright's claim against Wausau and Rogers is simple. Wausau and Rogers had no right to settle Bright's million dollar claim against the government for any sum and certainly not for $10,000. This dispute clearly arises out of the contractual relationship between these parties and is covered by the arbitration clause.

IV     Conclusion

For these reasons, we AFFIRM the district court's order compelling arbitration as to both Rogers and Wausau and dismissing the underlying cases.

GARWOOD, Circuit Judge, dissenting in part.

I concur in all of Judge Fay's cogent opinion except only so much thereof as holds that Wausau is bound by the arbitration provisions in the Bright/A-1 Subcontract. I respectfully dissent from the latter holding.

The majority correctly recognizes that the September 1993 Bright/A-1 Subcontract does not of itself bind Wausau to its arbitration provisions, notwithstanding Wausau's status as Miller Act performance and payment bond surety for the project general contractor A-1, because Wausau was not a party to the Bright/A-1 Subcontract.[1] The majority instead holds that Wausau became bound to Bright under the Bright/A-1 Subcontract, including its arbitration clause, by the combined effect of three documents Wausau executed subsequent to the Government's termination of A-1 for A-1's default on the project, namely: the May 20, 1994 Takeover Agreement between Wausau and the Government; the May 26, 1994 Completion Contract between Wausau and Rogers, the new completing prime contractor for the project hired by Wausau; and the June 14, 1994 Ratification Agreement between Wausau and Bright, as a result of which Bright later that month began and ultimately completed (or mostly completed), as a Rogers

---

[1] *Cf. U.S. v. Pool and Canfield, Inc.*, 778 F. Supp. 1088, at 1090 (W.D. Mo. 1991) (by issuing Miller Act payment bond as to general contract, surety did not agree to arbitrate claims by subcontractor merely because the subcontract between the subcontractor and the general contractor contained an arbitration clause).

22

subcontractor, the remaining work called for in the Bright/A-1 Subcontract. I interpret these documents, and their collective effect, differently than does the majority.

The combined effect of the three documents relied on by the majority is simply that Wausau, as authorized by the Government, undertook completion of the overall project by contracting with Rogers for Rogers to complete all the remaining work called for in A-1's contract with the Government, Wausau agreeing to assign to Rogers its rights in the uncompleted subcontracts so that Rogers would, in effect, be substituted for A-1 in those subcontracts with respect to the unfinished work thereunder, and Bright and Wausau agreeing that Wausau would pay Bright for all unpaid work done prior to A-1's termination and that Wausau had a 120 day option to require Bright to so agree to complete for Rogers, which option was timely exercised. The net result was in essence that Wausau paid Bright for unpaid work performed to date and Rogers was substituted for A-1 in the Subcontract as to the uncompleted work thereunder, and the subcontract's arbitration clause binds Rogers and Bright, but not Wausau, just as it had bound Bright and A-1, but not Wausau. There is nothing unusual or unfair about this. Bright was protected by the payment bond for the work it had done and did not have to agree to Wausau having the option to cause Rogers to step into A-1's shoes

23

under the Subcontract; but, the Subcontract was subject to termination by virtue of A-1's termination and Bright had no right to complete the work; and thus agreeing with Wausau as it did gave Bright, which had performed only about a third of the Subcontract, the opportunity, which shortly thereafter materialized, of being awarded the contract to complete the balance of the work on the same terms for a solvent prime contractor, Rogers.

Nothing in the documents relied on by the majority contains any agreement on Wausau's part be bound by A-1's obligations under the Subcontract unless Wausau itself undertook to complete the work, as opposed to having it done by a new completion prime contractor, and except that Wausau recognized and discharged its payment bond obligation to pay Bright for unpaid for work performed prior to A-1's termination.

Wausau's Takeover Agreement with the Government allows Wausau, in order to fulfill its performance bond obligations to the Government, to hire a completion prime contractor to complete the job, contains no arbitration clause (and incorporates no agreement which contains such a clause), and expressly provides it would *not* "be deemed to create any rights in favor of, or inure to the benefit of any third party or parties" (and would not enlarge Wausau's obligations under its bonds).

24

Wausau's Completion Contract with Rogers obligates Wausau to assign its rights in the uncompleted subcontracts to Rogers, but does not purport to recognize any obligations on the part of Wausau under those subcontracts, which Wausau was not a party to. And, of course, Bright (like the other subcontractors) was not a party to either the Completion Contract or the Takeover Agreement.

The *only* agreement executed by both Wausau and Bright is the Ratification Agreement. The Ratification Agreement commences by recitals that A-1 has been terminated by the Government, which has called on Wausau (referred to throughout as "Surety") under its performance bond, that Bright (referred to throughout as "Subcontractor") has made a claim under the payment bond, and that the total Subcontract amount is $493,653, the value of the work completed is $154,609, of which $39,038.25 has been paid, leaving a balance of $107,040.30 now owing plus $7,730.45 as five percent retainage (specified in clause (8) of the recitals). Paragraph (1) states that Wausau has paid Bright $107,040.30 and that Bright releases Wausau from "all claims for monies due this day, excluding retainage withheld." Paragraph (2) provides that "*Subcontractor* ratifies and agrees to complete its subcontract . . . and further agrees to start work within seven (7) days after request by Surety . . ." (emphasis added). Paragraph (3) provides:

> "Since the work under the contract with the Owner of the project may be completed by a new completion prime contractor, Subcontractor

25

agrees that Surety may assign its rights under the subcontract and this agreement to the completing prime contractor if done within one hundred twenty (120) days of the date of this agreement. Subcontractor will then look to the assignee for all further payments including all retainages whether withheld now as set forth above or in the future."

Paragraph (4), the last paragraph, makes provision respecting payment by Wausau to Bright of the $7,730.45 retainage for previously performed work, and states that "such payment will constitute complete fulfillment of the obligations of Surety to Subcontractor."[2]

Nowhere does the Ratification Agreement state that *Wausau* ratifies or is bound by the Subcontract. Rather, it expressly provides that if within 120 days Wausau assigns "its rights" thereunder and under the Ratification Agreement to a "new completion prime contractor," Bright "will then look to the assignee for all

_____

[2]On December 14, 1994, Wausau paid Bright the $7,730.45 retainage and Bright executed a release in favor of Wausau. Arguably, the payment was not required by paragraph (4), which provides in full:

"If within one hundred twenty (120) days of the date of this agreement Surety, its agent or assigns has not called upon Subcontractor to complete, Surety will pay the retainages withheld as set forth in Item (8) provided the work in place has been accepted by the Owner. Tender of such payment will constitute complete fulfillment of the obligations of Surety to Subcontractor."

Wausau explains that it construed paragraph (4) to apply whenever Wausau did not (within 120 days) call on Bright to complete for Wausau itself, as opposed to completing for the new completing prime contractor (Rogers). However, that construction is arguably inconsistent with the portion of the last sentence of paragraph (3) relating to retainages withheld "now as set forth above." That possible inconsistency is, however, irrelevant to any issue on this appeal, as is also whether the $7,730.45 payment was required by the payment bond. Bright has been paid the retainage for work done before A-1's termination, and that was accomplished long prior to the events giving rise to the present controversy.

26

further payments." This is just what happened. Wausau did assign its rights under the Ratification Agreement to Rogers, Bright in June 1994 did start to complete the unfinished Subcontract work as a subcontractor of Rogers, and Bright did look to Rogers for further payments. Bright has been paid in full, including retainage, for work done prior to A-1's termination. It is illogical to say that in these circumstances Wausau is somehow *implicitly* bound by the Subcontract, when Bright has *expressly* agreed to look only to the new prime completion contractor–Rogers–for "all further payments" and has agreed that Wausau's payment of the $7,730.45 retainage for work done for A-1 "will constitute complete fulfillment of the obligations of Surety to Subcontractor."